OPINION
{¶ 1} Michael S. Keggan pled no contest in the Fairborn Municipal Court to aggravated menacing, a first degree misdemeanor, after the court overruled his motion to suppress. The court found Keggan guilty and sentenced him to 180 days in jail, all of which was suspended on the condition of his good behavior. The court also imposed a fine of $200 and placed Keggan on [D1] probation for three years. The court further ordered that Keggan undergo a mental health assessment, that he have no contact with the victim, and that all of the weapons seized by the police be forfeited to the state. The probation department later informed Keggan that he would be subject to general conditions of probation, which included a prohibition from consuming alcohol or being in a place that serves alcoholic beverages. Keggan appeals from the denial of his motion to suppress and his sentence. He also appeals from the denial of his motion for Civ.R. 11 sanctions against the prosecutor.
 {¶ 2} For the following reasons, the denial of Keggan's motion to suppress, the order to undergo a mental health assessment, and the denial of the motion for sanctions will be affirmed. However, the general condition of probation related to alcohol and the forfeiture of several of his weapons will be reversed.
 I {¶ 3} According to the record, on April 22, 2005, Keggan was arrested for felonious assault and aggravated assault arising out of allegations that he had threatened his neighbor, David Dietz, with a shotgun. Keggan was subsequently charged by complaint with aggravated menacing. During the investigation of the allegations, the police seized several weapons from Keggan's vehicle and home, including a clear BB gun, two rifle-type BB guns, a rifle, and a pump-action Mossberg shotgun.
 {¶ 4} Keggan moved to suppress the weapons and all statements that he made to the police during the investigation, claiming that the police interrogated him while he was in custody without informing him of his rights under Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694, and that he had not consented to the search of his home. After an evidentiary hearing before a magistrate, the magistrate concluded that Keggan had consented to the search of his home and that the police did not violate Miranda. Keggan filed objections to the magistrate's ruling. On November 4, 2005, Keggan filed a motion for Civ.R. 11 sanctions against the prosecutor, alleging that prosecutor intentionally misled the court in his reply to Keggan's objections.
 {¶ 5} On December 28, 2005, the trial court overruled the motion for sanctions and the objections to the magistrate's ruling. The court made the following findings of fact and conclusions of law:
 {¶ 6} "On April 22, 2005, Officers Snyder and Hickey of the Beavercreek Police Department were dispatched to defendant's home on Ticonderoga Court, Beavercreek, Ohio, in regard to a weapons complaint [-] an allegation that a male was threatening another male with a shotgun. First on the scene was Officer Snyder who pulled alongside defendant's truck as defendant was attempting to pull away. Inside the truck were defendant and his girlfriend[,] Kathleen Neal. Officer Snyder had defendant exit the truck and raise his shirt in order to check for weapons. Defendant was then placed in the back of the police cruiser without handcuffs. Defendant advised Officer Snyder that a man had approached his residence and he had felt threatened by the man. He also advised Officer Snyder that he did not have a gun with him while the man was at his home. Defendant further advised the officer that he did have two BB guns in the back of this truck. With consent from defendant, Officer Snyder searched the rear of the vehicle and found a long rifle-type BB gun and a clear BB gun.
 {¶ 7} "Officer Hickey soon arrived at the scene and spoke with Officer Snyder. Shortly thereafter the complainant David Dietz arrived at the scene and spoke with Officer Snyder. Mr. Deitz identified the defendant as the individual who threatened him with the weapon. He further advised that the defendant had a pump-action shotgun which was black with a wood stock.
 {¶ 8} "Officer Hickey next spoke with defendant. During this time Officer Hickey spoke to the defendant in a conversational voice and did not have his weapon drawn. He asked the defendant whether he had a shotgun, to which defendant advised that all of his guns were at his grandparents' home. He further advised Officer Hickey that he did not have any guns in his house. However, he then changed his answer and stated that he had a BB gun leaning against the back door. The girlfriend consented to the request by Officer Hickey to look for the BB gun. However, Officer Hickey advised the girlfriend that she could not provide consent as she did not reside at the home. Defendant did consent to Officer Hickey searching the home, but limited the search to his bedroom, his brother's bedroom and his mother's bedroom.
 {¶ 9} "Officer Hickey entered the home with defendant's girlfriend. He did see a cable gun lock in plain view, but did not locate any guns.
 {¶ 10} "Officer Hickey then exited the residence and spoke with defendant a second time. The defendant advised Officer Hickey that the BB gun may be hidden in his mother's bedroom closet. Officer Hickey stated that he did not see any BB gun in the closet and the defendant offered to show the officer where it was. For safety reasons, Officer Hickey placed handcuffs on the defendant while entering the home and advised the defendant that it was for safety reasons and that he was not to reach for any guns. He further advised that the defendant was not under arrest at this time.
 {¶ 11} "Upon entering the house a second time, the defendant located the BB gun and they exited the house with it. Officer Hickey showed the gun to the complainant who advised that it was not the gun he had seen earlier. Officer Hickey approached the defendant who was in the cruiser without handcuffs and inquired if there was any other guns in the home. According to defendant, any other guns were at his grandparents' home. Therefore, Officer Hickey telephoned the grandparents who advised him that the guns were taken from the premises by defendant approximately two to three weeks ago. Upon relaying this conversation to the defendant, the defendant advised Officer Hickey that he did have a gun case in the attic. Upon gaining access to the attic, Officer Hickey found a black gun case under loose insulation which contained a Mossberg 500 action-pump [sic] shotgun and a single-action gun. The complainant identified the Mossberg 500 action-pump [sic] shotgun as the gun which defendant had when he threatened him.
 {¶ 12} "Officer Hickey then advised defendant of his Miranda rights and informed him that he was under arrest.
 {¶ 13} "The Court notes that in making this Decision that she gives deference to the magistrate who was the trier of fact and who was in a better position to judge the credibility and demeanor of the witnesses. She notes that the magistrate made a particular finding in making her findings of fact that she found little credibility on the part of Ms. Neal.
 {¶ 14} "The Court finds that Officer Hickey properly entered the residence based on the consent of the defendant. It is undisputed that the officer did not have a warrant to enter defendant's residence. Warrantless entries and searches of residences are presumptively unreasonable under the Fourth Amendment. The burden is on the state to overcome the presumption by demonstrating that the entry fell within one of the well-recognized exceptions to the warrant requirement. Katz v.United States (1967), 389 U.S. 347.
 {¶ 15} "One of the established exceptions to the warrant requirement is when an officer's entry is authorized by the voluntary consent of an occupant. Illinois v. Rodriguez (1990), 497 U.S. 177. The issue of whether consent was freely given is an issue of fact to be determined based upon the totality of the circumstances. In this case the Court finds that defendant was in the back seat of a cruiser, uncuffed, at the time Officer Hickey requested that he be allowed to search the residence. Although the defendant was in the rear of the cruiser, he was placed there for safety reasons based on a weapons complaint and finding two weapons in the rear of defendant's truck. At the time that Officer Hickey requested consent, he spoke in a conversational voice and his weapon was not drawn. Based on the totality of the circumstances, the Court finds that consent was voluntary, not coerced, thereby negating the requirement for a search warrant.
 {¶ 16} "The Court further finds that the officers were in an investigative stage and that Miranda was not required at the time they initially encountered the defendant. Furthermore, the Court notes that defendant was advised of his Miranda rights by Officer Snyder approximately 10 minutes after she arrived on the scene and again by Officer Hickey after locating the weapon. Again, although defendant was located in the rear seat of a cruiser, he was not handcuffed and was placed there for safety reasons based upon the nature of the dispatch. Furthermore, Officer Hickey had advised defendant that he was not under arrest. Defendant further argues that he requested that he be allowed to contact an attorney. In his objections he states that his mother is an attorney. However, no evidence was submitted that[,] at the time of the incident[, ] the officers had knowledge that defendant's mother was an attorney. The Court agrees that defendant did request to talk to his mother. However, he did not advise the officers that she was an attorney.
 {¶ 17} "* * *
 {¶ 18} "The Court hereby OVERRULES defendant's Motion to Suppress."
 {¶ 19} On January 17, 2006, Keggan entered a plea of no contest to aggravated menacing. He was sentenced as described supra. This appeal followed.
 II {¶ 20} Keggan raises seven assignments of error on appeal.
 {¶ 21} I. "THE LOWER COURT'S FINDINGS OF FACT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 22} II. "THE LOWER COURT ERRED BY FAILING TO SUPPRESS EVIDENCE OBTAINED WITHOUT A SEARCH WARRANT, IN VIOLATION OF HIS FOURTH AMENDMENT RIGHT AGAINST UNREASONABLE SEARCH AND SEIZURE, BASED ON CONSENT OF THE APPELLANT GIVEN WHILE HE WAS IN THE CUSTODY OF THE POLICE."
 {¶ 23} III. "THE COURT ERRED BY RULING THE APPELLANT'S FIFTH AMENDMENT RIGHTS AGAINST SELF-INCRIMINATION WERE NOT VIOLATED BY POLICE WHEN THEY ELICITED STATEMENTS FROM HIM AFTER HE HAD BEEN CLEARLY PLACED IN A CUSTODIAL STATUS WITHOUT BENEFIT OF A PROPER MIRANDA WARNING."
 {¶ 24} IV. "THE LOWER COURT ERRED BY NOT FINDING THAT ALL EVIDENCE AND STATEMENTS OF THE APPELLANT, AND EVERYTHING DERIVED FROM THEM, SHOULD BE EXCLUDED BY APPLICATION OF THE EXCLUSIONARY RULE."
 {¶ 25} In his first, second, third, and fourth assignments of error, Keggan claims that the trial court erred when it failed to suppress evidence obtained by the police. Keggan asserts that he was subjected to a custodial interrogation in violation of Miranda, that he did not voluntarily consent to the search of his home, and that he was prevented from contacting an attorney.
 {¶ 26} In reviewing the trial court's ruling on a motion to suppress evidence, this court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. SeeState v. Morgan, Montgomery App. No. 18985, 2002-Ohio-268. "But the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." Id.
 A. Miranda Violations {¶ 27} We begin with Keggan's claims that he was unlawfully subjected to questioning by Officers Snyder and Hickey without first being apprised of his Miranda rights and that he was denied access to an attorney.
 {¶ 28} The Fifth Amendment to the United States Constitution provides that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself." "The Fifth Amendment privilege against compulsory self-incrimination `protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'" Hiibel v. SixthJudicial Dist. Ct. of Nev., Humbolt Cty. (2004), 542 U.S. 177, 190,124 S.Ct. 2451, 159 L.Ed.2d 292, quoting Kastigar v. United States (1972),406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212; Ohio v. Reiner (2001),532 U.S. 17, 20, 121 S.Ct. 1252, 149 L.E.2d 158. The Sixth Amendment to the United States Constitution provides that an individual has a right to the assistance of counsel for his defense in all criminal prosecutions. Although this right attaches only at the initiation of adversarial criminal proceedings, the United States Supreme Court nevertheless has held that "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins." Davis v. United States (1994), 512 U.S. 452,457, 114 S.Ct. 2350, 129 L.Ed.2d 362, citing Miranda,384 U.S. at 469-73; State v. Williams, 99 Ohio St.3d 439, 2003-Ohio-4164,793 N.E.2d 446.
 {¶ 29} It is well-established that the police are not required to administer Miranda warnings to every individual they question. State v.Biros, 78 Ohio St.3d 426, 440, 1997-Ohio-204, 678 N.E.2d 891. Rather, only custodial interrogations trigger the need for Miranda warnings. Id., citing Oregon v. Mathiason (1977), 429 U.S. 492, 495, 97 S.Ct. 711,50 L.Ed.2d 714; State v. Wenzler, Greene App. No. 2003-CA-16,2004-Ohio-1811, ¶ 15. "An individual is in custody when there has been a formal arrest or a restraint of freedom of movement such that a reasonable man would believe that he is under arrest." Wenzler at ¶ 15.
 {¶ 30} Not all seizures rise to the level of a formal arrest. UnderTerry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity has occurred or is about to occur. State v. Martin, Montgomery App. No. 20270,2004-Ohio-2738, at ¶ 10, citing Terry, supra; State v. Molette, Montgomery App. No. 19694, 2003-Ohio-5965, at ¶ 10. This investigatory detention, or "Terry stop", is more intrusive than a consensual encounter, but less intrusive than a formal custodial arrest. An investigatory detention is limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions. Terry, supra. An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. United States v. Mendenhall (1980),446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497; Terry, 392 U.S. at 16, 19. The test for determining if a seizure is an arrest rather than aTerry-type detention is if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.Yarborough v. Alvarado (2004), 541 U.S. 652, 124 S.Ct. 2140,158 L.Ed.2d 938; State v. Castro (Sept. 20, 1995), Montgomery App. No. 14398.
 {¶ 31} In a typical investigatory detention, such as a routine traffic stop, individuals are not "in custody" for purposes of Miranda.Berkemer v. McCarty (1984), 468 U.S. 420, 440, 104 S.Ct. 3138,82 L.Ed.2d 317; State v. Martin, Montgomery App. No. 19186, 2002-Ohio-2621;State v. Healy (Aug. 4, 2000), Montgomery App. No. 18232. However, if the individual is, during the course of the detention, "subjected to treatment that renders him `in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda."Berkemer, 368 U.S. at 440; State v. Salyer (Apr. 10, 1998), Miami App. No. 97-CA-39.
 {¶ 32} Keggan asserts that he was "seized" and "not free to leave" and thus the trial court erred when it concluded that the officers were in an "investigative stage" and that Miranda warnings were not required when the police initially encountered him. Keggan also argues that the trial court erred in concluding that he had received Miranda warnings prior to his arrest. He emphasizes that Officer Hickey could not substantiate that Officer Snyder gave him Miranda warnings prior to his arrest, that the court ignored testimony that his path was blocked by Officer Snyder to prevent his departure, that Officer Snyder physically touched him by conducting a pat-down search prior to placing him in her cruiser, and that the officers prevented him from calling his mother or other counsel.
 {¶ 33} Upon review of the record, we find no fault with the trial court's conclusion that Keggan's detention was not custodial and that noMiranda violation occurred. Officer Snyder stopped Keggan's vehicle from leaving his residence at 1443 Ticonderoga Court based on a dispatch that a male was threatening another male with a shotgun at that address. Snyder clearly had a reasonable and articulable suspicion to initiate an investigatory detention so that she could determine whether Keggan had committed such an offense. Snyder lawfully asked Keggan and his girlfriend, Kathleen Neal, to exit the vehicle. Maryland v. Wilson
(1997) 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41.
 {¶ 34} Keggan argues that the trial court ignored the fact that Snyder conducted a pat down search prior to placing him in her cruiser. During the course of an investigatory stop and detention, law enforcement officers may conduct a pat down search for weapons if the officers have reasonable grounds to believe that the suspect is armed and dangerous.State v. Jordan, Clark App. No. 05-CA4, 2006-Ohio-1813, ¶ 26. "The officer need not be absolutely certain that the individual is armed. Rather, the issue is whether a reasonably prudent person in those circumstances would be warranted in the belief that his safety or the safety of others was in danger." Id.
 {¶ 35} Here, Snyder was dispatched on a report that a male had threatened another with a firearm. Based on the this report, Snyder reasonably requested Keggan to lift his shirt to show her that he did not have any weapons. Moreover, she was justified in patting him down to ensure that he was not armed. Such conduct by Snyder did not alter the nature of the encounter from an investigatory stop to a formal arrest.
 {¶ 36} After checking whether Keggan was armed, Snyder lawfully asked Keggan to sit in her cruiser. Although Neal testified that Snyder had asked Keggan to put his hands behind his back and had handcuffed him, Keggan and Snyder both testified that Keggan was not placed in handcuffs prior to being placed in Snyder's cruiser. Moreover, Hickey testified that he later placed Keggan in handcuffs when he took Keggan out of the cruiser. The trial court thus reasonably credited the testimony that Keggan was not handcuffed when he was first placed in the cruiser.
 {¶ 37} The record also indicates that Keggan had been informed that he was not under arrest at this time. Snyder testified that, when she first approached Keggan, he was not under arrest and that she had told him, "We'll see what's going on." Neal testified that when Keggan was placed in the cruiser, he asked Snyder if he was placed under arrest and she responded, "No. We're only doing this for your safety." Keggan further testified that, when he again asked if he was under arrest, he was also told "We don't know yet. We're still investigating." Although Keggan clearly was not free to leave the scene during this time, the totality of the circumstances indicate that Keggan's freedom of action was not restrained to a degree associated with a formal arrest and that a reasonable person would have understood that the restraint imposed was for safety, not arrest, purposes. The record thus supports the trial court's conclusion that Keggan was merely subject to a non-custodial investigatory detention when he was allegedly read Miranda warnings by Snyder. Contrast Salyer, supra.
 {¶ 38} Keggan challenges, as against the manifest weight of the evidence, the trial court's conclusion that Officer Snyder advised him of his Miranda rights approximately ten minutes after she arrived on the scene. According to Snyder, when Officer Hickey arrived at the scene, she talked to him for a few minutes and called the dispatcher to ask for the complainant, Dietz, to be telephoned and asked to come to the scene. Dietz arrived shortly thereafter and identified Keggan as the individual with the gun. Snyder testified during the suppression hearing that she issued Miranda warnings only once, and that she had informed Keggan of his Miranda rights after "he was identified as the subject with the gun." Snyder clarified that, after Dietz identified Keggan, she read Keggan his Miranda rights and then returned to talking with Dietz. At another point in her testimony, Snyder indicated that she had informed Keggan of his rights before Dietz gave his written statement, before the first time that they went into the house to search for a weapon, and before Keggan was brought into his house in handcuffs, which was Hickey's second search of the house. Stated differently yet again, Snyder further testified that she read Keggan his Miranda rights approximately ten minutes after she had arrived on the scene.
 {¶ 39} Keggan argues that Snyder's testimony is unsubstantiated, contradicted by Snyder's and other witnesses' testimony, and inconsistent with her own timeline of the events. He emphasizes that Snyder's written report of the events indicated that Keggan was informed that he was under arrest and read his rights after Hickey came out of the house for the third time with the shotgun. Keggan and Neal also testified that Snyder read Keggan his rights after the police searched his house for the third time. Keggan argues that Hickey could not substantiate Snyder's assertion that she issued Miranda warnings prior to questioning. Hickey testified that he had seen Snyder with her rights card in her hand but could not hear what she said. However, Hickey believed that Keggan had already been advised of his Miranda rights by Snyder when he arrested Keggan.
 {¶ 40} We acknowledge that the evidence supporting the conclusion that Snyder issued Miranda warnings early in the encounter is sparse. However, the magistrate and the trial court credited Snyder's testimony that she provided Miranda warnings prior to Hickey entering the home and approximately ten minutes after she arrived at the scene. Although the court could have reasonably rejected this testimony, we cannot conclude that the trial court lacked credible, competent evidence to support this finding.
 {¶ 41} Even assuming that Snyder had not issued Miranda warnings until after Hickey retrieved the Mossberg from the attic, we would find noMiranda violation throughout the encounter. As stated above, the record indicates that Keggan was informed that he was in the police cruiser for his safety, that he was not handcuffed until he was brought into the house, and that he was informed that he was not under arrest and that the officers were merely investigating the complaint. Even when Keggan was handcuffed upon entering the house, he was expressly informed that he was not under arrest and that he was being handcuffed for safety reasons while they searched for a weapon in the house. Specifically, Hickey testified that when he later removed Keggan from the cruiser to escort him into the house, he told Keggan: "You're not being placed under arrest, but I'm putting the handcuffs on you because I don't want you to run or retrieve a weapon that's in the house that we did not find." Hickey testified that Keggan understood this. According to Neal, Keggan was detained during the police investigation for approximately 30-45 minutes.[1] Again, although Keggan clearly was not free to leave the scene during the investigation, the record indicates that he was not in custody and would not have been entitled to Miranda warnings until he was arrested after the shotgun was located.
 {¶ 42} Finally, Keggan claims that he was prevented from making telephone calls and from obtaining counsel. Keggan asserts that this is relevant in two respects. First, he argues that this was a restriction of his liberty, which substantiated his claim that he was under arrest. Second, he claims that he was denied access to an attorney, in contravention of Miranda.
 {¶ 43} In our view, the officer's decision not to allow Keggan to use his cellular telephone was a reasonable restriction on Keggan's liberty and was not so restrictive as to alter the nature of his detention from an investigative one to a custodial one. To the extent that Keggan argues that the officers prevented him from contacting counsel, we also find no violation of Keggan's rights. At the outset, because Keggan was not in custody when he allegedly asked to contact his mother or an attorney, he had no constitutional right to counsel. Assuming, for sake of argument, that Keggan was in custody, a request for an attorney must be clear and unambiguous such that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to counsel. Davis, 512 U.S. at 459; see State v. Murphy,91 Ohio St.3d 516, 520, 2001-Ohio-112, 747 N.E.2d 765. Although the trial court found that Keggan had requested that he be allowed to contact his mother, there is no evidence that the officers knew that Keggan's mother was an attorney. Accordingly, the trial court properly concluded that the officers did not violate Keggan's right to counsel by preventing him from making telephone calls.
 B. Consent to Search the Residence {¶ 44} Keggan claims that the evidence from his home should have been suppressed because he did not voluntarily consent to the searches by Officer Hickey. He argues that he was seized, i.e, that his conduct with the officers was not consensual, and that his alleged consent was the product of "the dominance of the police officers, their persistence in questioning and requesting permission to search, and their physical control of him."
 {¶ 45} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. Terry, supra. In general, the warrantless entry of a person's house is unreasonableper se. Georgia v. Randolph (2006), — U.S. -, 126 S.Ct. 1515, 1520,164 L.Ed.2d 208; Payton v. New York (1980), 445 U.S. 573, 586,100 S.Ct. 1371, 63 L.Ed.2d 639; Schneckloth v. Bustamonte (1973), 412 U.S. 218,93 S.Ct. 2041, 36 L.Ed.2d 854. However, a police officer may validly enter and search a home, without a warrant, when the officer has obtained the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a non-present co-occupant. Randolph, 126 S.Ct. at 1515; Illinois v. Rodriguez (1990),497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148; United States v.Matlock (1974), 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242.
 {¶ 46} To be valid, the consent cannot be the product of coercion. "`Consent' that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." Florida v. Bostick (1991), 501 U.S. 429, 438, 111 S.Ct. 2382,115 L.Ed.2d 389. Whether a citizen has voluntarily consented to a search is determined by reviewing the totality of the circumstances. UnitedStates v. Drayton (2002), 536 U.S. 194, 207, 122 S.Ct. 2105,153 L.Ed.2d 242; Ohio v. Robinette (1996), 519 U.S. 33, 117 S.Ct. 417,136 L.E.2d 347.
 {¶ 47} We agree with Keggan that his encounter with the police was not consensual. As stated above, Keggan was subject to an investigatory detention when he consented to the search of his residence and was questioned by the officers. However, the fact that Keggan was detained did not, by itself, preclude him from voluntarily cooperating with the officers. See Bustamonte, 412 U.S. at 227-28, 232-33 (noting that "circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning"). Simply stated, citizens may elect to provide voluntary statements or give consent to searches during any encounter with law enforcement officers regardless of whether that encounter constitutes a consensual encounter, a Terry stop, or an arrest.
 {¶ 48} According to Hickey's testimony, he initially asked Keggan if he could go into the house to look for a gun after Keggan had indicated that there was a BB gun leaning against the back door. Before Keggan responded, Neal said, "I'll show you." Hickey asked her if she lived there. When Neal said that she did not, Hickey told Keggan that he was the only one who could give permission for him to check the house. Keggan responded that Hickey could check his room, his brother's room, and his mother's room only. Hickey subsequently went inside the home with Neal. Although Hickey saw a cable gun lock, which Neal indicated was usually used by Keggan to lock up a shotgun, they did not find a gun. After Hickey and Neal left the residence, Hickey informed Keggan that he did not find a gun by the back door. Keggan responded that he had hidden it in the back of his mother's closet. Hickey stated that he had not seen it. Keggan replied, "I can show you where it's at." Hickey responded, "That's fine," and the two subsequently retrieved the weapon from the house together. Hickey showed the gun to Dietz, who stated that he did not think that was the weapon that Keggan had pointed at him because it did not have a pump.
 {¶ 49} Hickey asked Keggan if there were any other guns in the house. Keggan initially responded that his shotguns were at his grandparents' house. However, after Hickey called Keggan's grandparents and was told that Keggan had retrieved the guns two to three weeks before, Keggan admitted that the guns were in a gun case in the attic. Hickey testified that he went back into the house with Keggan's permission, and accessed the attic with a ladder from the fire department. Hickey testified that he had difficulty finding the gun case, that he radioed to Snyder to ask Keggan exactly where it was, and that Keggan had stated that it was under insulation and had offered to come to the attic to show him. The gun case contained a Mossberg 500 pump-action shotgun, which Dietz subsequently identified as the one Keggan had used to threaten him, and a rifle. Hickey testified that Keggan never withdrew his consent to search the house.
 {¶ 50} In contrast, Keggan testified that he was threatened by Hickey. Keggan testified: "He got disturbed because I did not want to give him the rest of the guns that were not involved in this case. And I told him, no, repeatedly, that I did not want to give them to him. And he said, Well, I'm going to get them one way or another, and if you keep dickin' with me, you're just going to get in more trouble." Keggan stated that he gave consent for the police to search his house after he had told them "no" three times.
 {¶ 51} In its ruling, the trial court apparently found Hickey to be more credible. It found that Keggan was placed in the rear of the cruiser for safety reasons and that he was not handcuffed. The court further found that Hickey requested consent to search the residence using a conversational voice and his weapon was not drawn. The trial court ultimately concluded that Keggan's consent was voluntary. In light of the trial court's findings of facts, we find no basis to conclude that Keggan's consent was involuntary due to alleged threats by Hickey or due to the nature of his detention.
 {¶ 52} In sum, we conclude that the officers acted lawfully when they questioned Keggan at the scene and searched his residence. Accordingly, the trial court did not err in overruling Keggan's motion to suppress.
 {¶ 53} The first, second, third, and fourth assignments of error are overruled.
 {¶ 54} V. "THE COURT IMPOSED TERMS OF PROBATION THAT VIOLATE THE STATUTORY INTENT OF PROBATION AND ARE OVERBROAD BY RESTRICTING THE APPELLANT'S USE OF ALCOHOL AND PROHIBITING THE APPELLANT TO BE `IN A BAR OR ANY PLACE THAT SERVES ALCOHOLIC BEVERAGES, AND THE COURT ABUSED ITS DISCRETION IN SENTENCING THE APPELLANT TO A MENTAL HEALTH EVALUATION [AND] TO UNDERGO A MENTAL HEALTH EXAMINATION."
 {¶ 55} In his fifth assignment of error, Keggan challenges the conditions of probation that he not use alcohol or be in a place that serves alcoholic beverages and that he undergo a mental health evaluation.
 {¶ 56} In sentencing Keggan, the court stated, in pertinent part:
 {¶ 57} COURT: "Mr. Keggan, I am fining you $200 and costs. I am suspending 180 days in jail, no good time, suspending all of them on condition of your good behavior."
 {¶ 58} VICTIM ADVOCATE: "I'm sorry, your Honor, to interrupt. We also ask for a no contact order as part of probation."
 {¶ 59} COURT: "I'm suspending 180 days in jail, no good time, on condition of your good behavior for 3 years. I'm placing you on probation for up to 3 years so that you can get a mental health assessment and follow up on any recommendations which might be made. I know that you were on probation in Xenia not too terribly long ago. It would be nice to have some continuity with that, so if you could talk to your probation officer here about maybe what you did, how far along you came with your treatment, maybe which agency, maybe we could add onto that or build on that.
 {¶ 60} "Also, would there be any reason that you would have to have contact with Mr. Dietz?"
 {¶ 61} DEFENDANT: "No, you Honor."
 {¶ 62} * * *
 {¶ 63} COURT: "I'm going to make an order that you have no contact with Mr. Dietz. * * *"
 {¶ 64} The court also ordered that all of Keggan's weapons be forfeited to the state. The court's sentence, as stated orally, was subsequently written in the record.
 {¶ 65} After the hearing, Keggan apparently met with the probation department and was provided a pre-printed form which contained general conditions of probation. Paragraph 7 of those conditions stated: "I will not consume or possess any alcohol or drug of abuse or be in a bar or place that serves alcoholic beverages." Paragraph 14 contained three handwritten specific conditions: "good behavior for 3 years," "complete mental health assessment and follow recommendation," and "no contact with victim." The form indicated that "[t]he foregoing rules for all Probationers, both general and specific, have been approved by the Judge of the Fairborn Municipal Court. A copy of these rules will be furnished to you and/or attorney for future reference." The form was signed by Keggan and a probation officer. [2]
 {¶ 66} A court possesses broad discretion in determining the conditions of probation. However, its discretion is not unlimited.State v. Jones (1990), 49 Ohio St.3d 51, 550 N.E.2d 469; see, also,State v. McCaleb, Greene App. No. 05CA155, 2006-Ohio4652, ¶ 47. InJones, the Supreme Court of Ohio held that a condition of probation must be related to the interest of doing justice, rehabilitating the offender, and insuring his good behavior. See State v. Craft, Greene App. No. 2001-CA-128, 2002-Ohio-5127. The Jones court held that, in determining whether conditions of probation are proper, courts should consider whether the condition (1) is reasonably related to rehabilitating the offender, (2) has some relationship to the crime of which the offender was convicted, and (3) relates to conduct which is criminal or reasonably related to future criminality and serves the statutory ends of probation. Id. at 53; McCaleb at ¶ 49.
 {¶ 67} As noted by Keggan, there is no evidence in the record that he had a problem with alcohol that required treatment or that alcohol played any role in the aggravated menancing offense. In addition, the record contains no evidence that a restriction on alcohol is related to possible future criminal acts by Keggan. Moreover, we agree with Keggan that the restriction against him being in a "place that serves alcoholic beverages" is overbroad, because it would preclude him from patronizing family restaurants, amusement parks, bowling alleys, other family entertainment centers, or any other place where beer and wine might be served. The trial court thus abused its discretion when it prohibited Keggan from consuming alcoholic beverages or being in a bar or places that serve alcoholic beverages.
 {¶ 68} Keggan also challenges, as overbroad, the requirement that he complete a mental health assessment and any follow-up recommendations. We disagree. Although Keggan states that his conviction "arose from an incident in which the Appellant accosted a trespasser on his own property," the court could have reasonably considered Keggan's conduct to be an unreasonable and excessive response to Deitz's presence on his property. As such, the court could have reasonably concluded that a mental health assessment and any attendant treatment would be beneficial to rehabilitating Keggan and that the condition was related to his aggravated menacing offense. Moreover, an assessment of whether Keggan had any mental health issues, along with the requirement that Keggan complete any follow-up recommendations, could reasonably relate to similar future criminal conduct by Keggan. Accordingly, the trial court acted within its discretion when it required Keggan to complete a mental health assessment and any follow-up recommendations.
 {¶ 69} The fifth assignment of error is sustained in part and overruled in part.
 {¶ 70} VI. "THE COURT ERRED IN ORDERING FORFEITURE TO THE STATE OF NON-CONTRABAND PROPERTY ORIGINALLY SEIZED AS EVIDENCE."
 {¶ 71} In his sixth assignment of error, Keggan asserts that the trial court erred when it ordered the forfeiture of all of the weapons seized by the police.
 {¶ 72} Before depriving a person of property, the state is generally required to provide a hearing regarding the matter. Zinermon v.Burch (1990), 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100. Forfeitures of property are disfavored by the law, and when possible an individual's property rights are preferred over forfeiture statutes.Dept. Of Liquor Control v. Sons of Italy Lodge 0917 (1992),65 Ohio St.3d 532, 534, 605 N.E.2d 368.
 {¶ 73} At the plea and sentencing hearing, Keggan requested the return of the weapons that were seized and were then held by the Beavercreek police department. He asked that they be returned to his grandparents for safekeeping. Keggan's counsel indicated that the weapons were valued at close to $1,000. The state objected to the request, arguing that Keggan had lied to the police that the weapons were with his grandparents' home, and it expressed concern that "this is going to happen again." The state reminded the court that a pump-action shotgun had been used in the offense and that other weapons had been seized.
 {¶ 74} In ordering the weapons to be forfeited, the trial court ruled: "And I have made the decision on the weapons, and I am going to forfeit the weapons to the State based on the fact that [a] weapon was used in the incident itself and based on the fact that there were allegations at one point that the weapons were at the grandparents' house. That was not true. They were at the grandparents' house, but then they were subsequently taken from the house by you. I also believe there's a chance it could happen again. The safest thing would be for you not to have any weapons whatsoever, so I'm ordering the weapons forfeited." The court did not specify which statute authorized it to order the forfeiture.
 {¶ 75} In its brief, the state asserts that the court was acting upon the authority granted by R.C. 2933.41(C)(1) (2). R.C. 2933.41 concerns the disposition of "any property * * * that has been lost, abandoned, stolen, seized pursuant to a search warrant, or otherwise lawfully seized or forfeited, and that is in the custody of a law enforcement agency." Although R.C. 2933.41 is not a forfeiture statute, deprivation of an individual's right to possession of his property is as onerous as if the state had declared a forfeiture. State v. Lilliock (1982), 70 Ohio St.2d 23, 25, 434 N.E.2d 723. Accordingly, R.C. 2933.41 must be strictly construed against the state. Id. Loss of property rights under R.C. 2933.41 is proper when (1) the property is used in the commission of a crime, other than a traffic offense, which involves the owner of the property, or (2) the court determines that, due to the nature of the property or the circumstances of the person, it would be unlawful for the person to possess the property. R.C. 2933.41(C); State v.Crawford, Greene App. No. 2005-CA-29, 2006-Ohio-410, ¶ 7.
 {¶ 76} Here, the state argues that R.C. 2933.41(C)(1) applies to the shotgun, and that R.C. 2933.41(C)(2) applies to Keggan's other weapons. While we find no fault with the loss of ownership of the shotgun, which was used in the commission of the offense, the trial court erred when it ordered the forfeiture of the remaining weapons. The three BB guns and the rifle were not used in Keggan's confrontation with Dietz, and there is no evidence in the record that Keggan was under a legal disability which would have prevented him from possessing the guns in the future. Accordingly, we agree with Keggan that the court erred when it ordered the remaining guns forfeited to the state. See State v. Hanauer (May 3, 1995), Montgomery App. No. 14492.
 {¶ 77} The sixth assignment of error is sustained in part and overruled in part.
 {¶ 78} VII. "THE COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION FOR RULE 11 SANCTIONS AGAINST THE PROSECUTOR FOR HIS KNOWING MISREPRESENTATION OF LAW AND FACT TO THE TRIAL COURT IN HIS REPLY BRIEF, THUS VIOLATING HIS DUTY OF CANDOR TO THE COURT."
 {¶ 79} In his seventh assignment of error, Keggan claims that the trial court erred when it failed to impose sanctions against the prosecutor. He states that the prosecutor made three knowing misstatements of fact and two knowing misstatements of law in his reply to Keggan's objections to the magistrate's decision. Keggan argues that the prosecutor's misstatements were material, because they led to the trial court's erroneous ruling on his motion to suppress.
 {¶ 80} "The decision to impose sanctions pursuant to Civ.R. 11 lies within the discretion of the trial court. Absent an abuse of discretion, such decision will not be reversed." State ex rel. Fant v. Sykes ( 1987), 29 Ohio St.3d 65, 65, 505 N.E.2d 966; see, also, Burns v.Henne (1996), 115 Ohio App.3d 297, 685 N.E.2d 294.
 {¶ 81} Upon review of the record, the trial court did not abuse its discretion when it determined that sanctions were not warranted. We find no evidence that the prosecutor made intentional misstatements of law or fact, nor do we find the prosecutor's admitted errors to be egregious. To the contrary, in general, the prosecutor's brief constituted reasonable advocacy of the state's position that the magistrate's decision was supported by law and by the evidence presented at the suppression hearing.
 {¶ 82} The seventh assignment of error is overruled.
 {¶ 83} The judgment of the trial court overruling Keggan's motion to suppress, the trial court's order that Keggan undergo a mental health assessment, and the court's denial of the motion for sanctions will be affirmed. {¶ 84} The general condition of probation related to alcohol and the forfeiture of Keggan's weapons, other than the shotgun, will be reversed. The cause will be remanded for further proceedings consistent with this opinion.
GRADY, P.J. and BROGAN, J., concur.
[1] Although not specifically raised by Keggan, we note that the length of his detention did not necessarily convert the Terry stop into a custodial or unreasonable detention. During his detention, Keggan gave several conflicting stories to the officers as to whether he had weapons in the house and the location of those weapons. Accordingly, the officers continued to have a reasonable, articulable suspicion that Keggan may have committed the offense they were investigating and that there might have been additional weapons at the scene. The record further indicates that the officers acted diligently in investigating the matter. See United States v. Sharpe (1985), 470 U.S. 675,105 S.Ct. 1568, 84 L.Ed.2d 605 (rejecting a hard-and-fast time limit for a permissible Terry stop). 
[2] Upon review of the record, it appears that general conditions, including the condition that Keggan refrain from consuming alcohol and from frequenting establishments that serve alcohol, were not imposed by the trial court at the sentencing hearing. Although the court informed Keggan that he would be sentenced to probation and indicated the specific conditions, it made no mention of the general conditions of probation. The court did not articulate the general conditions to Keggan, nor did it indicate in general terms that he was subject to general conditions of probation. Although the pre-printed form indicates that the conditions had been approved by "the Judge of the Fairborn Municipal Court," the court did not sign the form provided to Keggan nor was it entered in the record. In light of the absence of any mention of the general conditions by the court, it appears that the court did not impose the general conditions, including paragraph 7, as part of Keggan's sentence. On appeal, however, Keggan challenges only the validity of paragraph 7. Accordingly, we confine ourselves to the issue that he presents.