[Cite as *State v. Laster*, 2018-Ohio-3601.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27762 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-1814 |
| | : | |
| ANTONIOS E. LASTER | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 7th day of September, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

J. DAVID TURNER, Atty. Reg. No. 0017456, P.O. Box 291771, 101 Southmoor Circle NW, Kettering, Ohio 45429
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} In this case, Defendant-Appellant, Antonios Laster, appeals from his conviction and sentence on one count of improper handling of a firearm in a vehicle (loaded, no license), a felony of the fourth degree. Following Laster's no contest plea, the court sentenced him to up to five years of community control sanctions.

{¶ 2} Laster contends that the trial court's decision on his motion to suppress is voidable, and should be voided, because the certificate of assignment from the Supreme Court of Ohio did not authorize the visiting judge to preside over the suppression hearing. In addition, Laster contends that the trial court erred in overruling his suppression motion because he was denied his right to be free from unreasonable searches and seizures and to be free from self-incrimination during custodial interrogation.

{¶ 3} For the reasons discussed below, we conclude that no prejudicial error occurred in the trial court, concerning either the assignment of the trial judge or the decision overruling the motion to suppress. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} On August 18, 2016, the State filed an indictment charging Laster with one count of improper handling of a firearm in a motor vehicle (loaded/no license), and one count of carrying a concealed weapon (loaded/ready at hand), both fourth-degree felonies. After pleading not guilty, Laster filed a motion to suppress on November 15, 2016, and the trial court scheduled a hearing for December 9, 2016.

{¶ 5} A visiting judge heard the evidence and filed a decision on December 16,

2016, overruling the motion to suppress. Eventually, on October 5, 2017, Laster pled no contest to one count of improper handling of a firearm, in exchange for the State's agreement to dismiss the charge of carrying a concealed weapon. After overruling Laster's motion for intervention in lieu of conviction, the trial court sentenced Laster to up to five years of community control sanctions. This timely appeal followed.

## II. Failure to Correctly Appoint Visiting Judge

{¶ 6} Laster's First Assignment of Error states that:

The Certificate of Assignment From Chief Justice O'Conner Assigning the Honorable William H. Wolff, Jr., to Preside for the Period of August 8, 2016 through August 12, 2016 Did Not Authorize Judge Wolff to Preside Over the Suppression Hearing Held December 9, 2016 and Therefore Renders the Decision Overruling the Motion to Suppress Voidable.

{¶ 7} Under this assignment of error, Laster notes that the suppression hearing began at 1:30 p.m. on December 9, 2016, prior to the filing of the Supreme Court of Ohio's certificate of assignment of Judge Wolff later that day. In addition, the date on which the hearing was held was outside the time period that the certificate filed in the trial court specified for the assignment. Laster acknowledges that he failed to object to the fact that Judge Wolff presided over the suppression hearing. However, Laster contends that trial counsel could not possibly have objected because the certificate was not journalized until after 3:00 p.m. on the same day that the hearing was held. Laster further argues that even if he were considered to have waived the point, we should conclude that plain

error occurred.

{¶ 8} Article IV, Section 6(C) of the Ohio Constitution provides that "[a]ny voluntarily retired judge, or any judge who is retired under this section, may be assigned with his consent, by the chief justice or acting chief justice of the supreme court to active duty as a judge * * * ." The Supreme Court of Ohio has held that, "[i]n a court that possesses subject-matter jurisdiction, procedural irregularities in the transfer of a case to a visiting judge affect the court's jurisdiction over the particular case and render the judgment voidable, not void." *In re J.J.*, 111 Ohio St.3d 205, 2006-Ohio-5484, 855 N.E.2d 851, paragraph one of the syllabus. The court further stressed that complaining parties have a duty to object in the trial court in order to preserve the error for appeal. *Id.* at ¶ 15.

{¶ 9} The certificate of assignment from the Supreme Court of Ohio that was filed in the trial court on December 9, 2016, assigned Judge Wolff, "effective April 18, 2016 to preside in the Montgomery County Court of Common Pleas, General Division, for the period of August 8, 2016 through August 12, 2016 and to conclude any proceedings in which he participated that are pending during that period." Doc. #27, p.1. The number on the certificate of assignment is 16JA0929, and as the State notes, the above information conflicts with what is reflected on the website of the Supreme Court of Ohio. An assignment search on the website of the Supreme Court of Ohio for the listed number (16JA0929) indicates that Judge Wolff's assignment was effective April 18, 2016, and was a general assignment for the period of December 5, 2016 through December 9, 2016. *See* http://www.supremecourt.ohio.gov/judgeassignmentsearch/, accessed August 13, 2018. The suppression hearing fell within this latter period.

{¶ 10} As was noted, the certificate of assignment that was filed in the trial court does not reflect the dates the Supreme Court of Ohio apparently intended. Thus, the assignment as filed did not cover the date on which the suppression hearing was held, and there is no indication in the record that the suppression hearing was a conclusion of any proceeding Judge Wolff held between August 8 and August 12, 2016. This could not have occurred in any event, because the indictment against Laster had not even been filed by that time.

{¶ 11} Laster acknowledges that the incorrect assignment would make the decision only voidable, not void. We agree. However, Laster failed to object in the trial court. In *J.J.*, the Supreme Court of Ohio concluded that the appellee (a father who had lost custody) had waived the procedural irregularity by failing to object. *J.J.*, 111 Ohio St.3d 205, 2006-Ohio-5484, 855 N.E.2d 851, at ¶ 16-17 (noting that "[a] party may timely object to the authority of a visiting judge on the basis of an improper case transfer or assignment, but failure to timely enter such an objection waives the procedural error"). *Accord State v. Stansell*, 2d Dist. Montgomery No. 23630, 2010-Ohio-5756, ¶ 29.

{¶ 12} The purpose of making timely objections is to alert trial courts to potential errors at a time when they can be corrected. *See, e.g., State v. Blakeman*, 2d Dist. Montgomery No. 18983, 2002 WL 857659, *3 (May 3, 2002).

{¶ 13} We also reject the argument that Laster's counsel could not have known to object because the certificate of assignment was not filed until after the hearing. As the State notes, counsel met with the judge in chambers prior to hearing. *See* Transcript of Suppression Hearing, p. 39 (indicating that the judge met with counsel before the hearing). Since a certificate of assignment was obviously not in the record at that time,

trial counsel could have raised an issue with the judge before the hearing. The judge also did not file a decision until about a week after the hearing. If the assignment was defective (as it clearly appears to have been on its face), the issue could have been raised before the court filed the suppression decision.

{¶ 14} More importantly, Laster did not enter a plea until October 6, 2017, almost ten months after the suppression decision was filed. Notably, rulings on suppression motions are interlocutory and may be reconsidered before final judgment. *State v. Ross*, 2014-Ohio-2867, 15 N.E.3d 1213, ¶ 47 (9th Dist.); *State v. Donley*, 2017-Ohio-562, 85 N.E.3d 324, ¶ 148 (2d Dist.). Therefore, if the certificate of assignment were truly an issue, Laster could have objected during the lengthy time that elapsed between the suppression decision and his no contest plea. Accordingly, we conclude that Laster waived this alleged error.

{¶ 15} Even if we decided otherwise, and considered the issue on the basis of plain error, Laster failed to advance any argument concerning what exceptional circumstances or miscarriage of justice exist that would justify noticing plain error. *See State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Consequently, even if we applied the plain error doctrine, there is no reason to find plain error.

{¶ 16} Based on the preceding discussion, the First Assignment of Error is overruled.


III.   Suppression Decision

{¶ 17} Laster's Second Assignment of Error states that:

Appellant [Was] Denied His Fourth Amendment Right [Against] Unreasonable Search and Seizure and His Fifth Amendment Right Prohibiting Self-Incrimination During Custodial Interrogation.

{¶ 18} Laster advances three arguments under this assignment of error, and we will consider them separately.

A. The Anonymous Tip

{¶ 19} Laster first contends that an anonymous tip did not justify his stop and that subsequent events did not corroborate the tip, making the stop and seizure unlawful under the Fourth Amendment. Laster has waived this argument, however, because he failed to raise it in his suppression motion or at the suppression hearing. *See* Doc. #23, Motion to Suppress (seeking to suppress only oral and written statements due to lack of *Miranda* warnings and failure to fully inform of *Miranda* rights); and Transcript of Suppression Hearing, p. 6 (defense counsel indicates that the issue is the failure of the police to provide *Miranda* warnings before asking questions during a custodial interrogation, and perhaps a defect in the *Miranda* warnings that were subsequently given). Again, arguments not made in the trial court are waived. *Blakeman*, 2d Dist. Montgomery No. 18983, 2002 WL 857659, at *3; *State v. Sibole*, 2d Dist. Clark No. 2017-CA-68, 2018-Ohio-3203, ¶ 9.

{¶ 20} Laster has not claimed a basis for plain error; he has simply presented case law indicating that that in situations involving anonymous tips, the State must show that subsequent events corroborated the tip. Appellant's Brief, p. 12.

{¶ 21} As was noted, we take notice of plain error "with the utmost caution, under

exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus. Having reviewed the transcript of the suppression hearing, we see no evidence of error or plain error.

{¶ 22} As to the facts, the only witnesses who testified at the suppression hearing were a University of Dayton ("UD") Police Officer, Joseph Wilhelm, and a city of Dayton Detective, Mark Gundelfinger. Furthermore, the facts were essentially undisputed

{¶ 23} According to the evidence, the police received an anonymous call about weapons on June 10, 2016. The caller stated that an individual with a gun was sitting in a black car near a Cold Stone Creamery. The gun was described as being in the man's lap, and the caller indicated that the person did not look as if he should have a gun. In addition, the caller described the car as a black Nissan Versa and gave the police the vehicle's license plate. Finally, the caller reported something about loudness.

{¶ 24} UD Officer Joseph Wilhelm was the first individual on the scene. He arrived at 149 Jasper Street, in Dayton, Ohio, at around 6:00 p.m., which was about five minutes after the call was broadcasted. The area around 149 Jasper contains local restaurants and businesses, including a pizza place and an ice cream shop (Cold Stone Creamery). The location was directly adjacent to the UD campus, and numerous people were in the area.

{¶ 25} At the time, Wilhelm was working by himself and was in uniform, in a marked police cruiser. When Wilhelm arrived, he looked for the described vehicle and saw it parked on the street, close to the sidewalk. Wilhelm parked his cruiser in the middle of the street, about fifteen feet away, with the overhead lights on and the engine running. Wilhelm then got out and made contact with the driver, Laster, who was beginning to eat

an ice cream cone. Two females were also in the car: one was sitting in the front passenger seat, and the other was in the rear passenger seat.

**{¶ 26}** Wilhelm testified that Laster was not under arrest when the initial contact was made. Wilhelm did not yell at Laster, did not have his firearm out, and did not tell Laster that he was under arrest. However, Wilhelm did testify that at the point of his initial contact with Laster, Laster was not free to leave.

**{¶ 27}** Based on the caller's remarks and the fact that a gun may have been on the scene, Wilhelm ordered Laster to put his hands on the steering wheel. He testified that, if a gun were present, he did not want Laster to reach for it. This was for his own safety and the safety of bystanders. Wilhelm was also standing quite close to the driver's side window of Laster's car.

**{¶ 28}** After ordering Laster to put his hands on the wheel, Wilhelm asked if a gun were in the vehicle, and Laster responded affirmatively. Wilhelm asked where the gun was, and Laster said it was under the seat. Wilhelm then asked Laster if he had a CCW permit, and Laster said no. No *Miranda* warnings had been administered before Wilhelm asked Laster these questions. Wilhelm testified that while he was asking Laster these questions, he was trying to investigate the situation.

**{¶ 29}** At that point, Wilhelm asked Laster to step out of the vehicle so that he could separate Laster from the gun. After patting Laster down, Wilhelm placed him in handcuffs and seated him in the rear of his police cruiser. Wilhelm did not ask Laster any further questions.

**{¶ 30}** After Wilhelm removed Laster from the Nissan, another UD officer, Officer Fong, arrived on the scene. Fong did not ask Laster any questions. Three Dayton

police officers also arrived on the scene, including Detective Gundelfinger (who was a patrol officer at the time). Gundelfinger was the last officer to arrive. Because the incident occurred off campus, Gundelfinger took control of the investigation.

{¶ 31} At that time, the Nissan's doors were open, and Gundelfinger peeked inside. When he did so, he saw the gun. He then made contact with Laster, who was sitting inside a police cruiser. Gundelfinger administered *Miranda* warnings using a card that the prosecutor supplies to the police. When the warnings were administered, Laster answered affirmatively to each question. Laster then said that he wanted to speak to Gundelfinger. No testimony was offered about what Laster said to Gundelfinger.

{¶ 32} As was noted, Laster was subsequently charged with improperly handling a firearm in a vehicle and with carrying a concealed weapon. Laster then pled no contest to the first charge after the court overruled his motion to suppress.

{¶ 33} "A police officer may rely on outside information provided directly to him, such as tips from informants, or on information relayed to him via a flyer or radio dispatch." *State v. Hamilton*, 1st Dist. Hamilton No. C-160247, 2017-Ohio-8140, ¶ 13, citing *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). "Where an informant's tip is relied upon, the informant's veracity and reliability and his basis for knowledge must be assessed under the totality of the circumstances to determine whether the tip establishes reasonable suspicion." *Id.*, citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶ 34} While " 'an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity,' * * * under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an]

investigatory stop.' " (Emphasis sic.) *Navarette v. California*, 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014), quoting *Alabama v. White*, 496 U.S. 325, 327, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

{¶ 35} In *Navarette*, a caller described having been run off the road by a vehicle, and also identified the make and license plate of the truck. *Id.* at 395. The court noted that by reporting this, the caller "necessarily claimed eyewitness knowledge of the alleged dangerous driving. That basis of knowledge lends significant support to the tip's reliability." *Id.* at 399. This is similar to the tip in the case before us, where the caller described the vehicle, including the license plate, reported seeing a gun in the suspect's lap, and indicated that the suspect was sitting in his vehicle near Cold Stone Creamery.

{¶ 36} In *Navarette*, the Supreme Court also relied on the timeline of events, which suggested that the caller had reported the incident soon after she had been run off the road. The court stressed that this "sort of contemporaneous report has long been treated as especially reliable." *Id.* at 399. Again, in the case before us, the police arrived on the scene about five minutes after the broadcast and observed the car that had been identified. In addition, the car was still sitting in the location the caller had described, near Cold Stone Creamery.

{¶ 37} The court further observed in *Navarette* that "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.' " *Id.* at 401, quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This standard requires law enforcement officers to have " 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *Id.* at 396, quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621

(1981).

{¶ 38} Given the caller's description that the individual had a gun visible on his lap while sitting in a motor vehicle located in a highly populated retail area and that there was loud behavior, Officer Wilhelm had reasonable suspicion that criminal activity was afoot. In any event, the record indicates that Officer Wilhelm's actions constituted a lawful, consensual encounter.

{¶ 39} Based on the preceding discussion, there are no exceptional circumstances that apply here, and the record does not demonstrate manifest injustice that would warrant notice of plain error.


### B.  Whether the Detention Was Custodial or Investigatory

{¶ 40} Laster's second argument is that he was restrained in a way that would have led reasonable persons to believe that they were under arrest.  The trial court overruled Laster's motion to suppress based on its conclusion that Laster's statements to the police were the product of an investigatory detention, not custodial interrogation.

{¶ 41} In ruling on a motion to suppress, a trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses."  *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994).  Accordingly, when we review suppression decisions, we must "accept the trial court's findings of fact if they are supported by competent, credible evidence."  *Id.*  "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard."  *Id.*

{¶ 42} According to Laster, Officer Wilhelm restrained him in a way that would have led a reasonable person in his position to believe he was under arrest, and Wilhelm, therefore, should have given him *Miranda* warnings before eliciting incriminating information.

{¶ 43} In order to "protect the Fifth Amendment privilege against self-incrimination," *Miranda* requires police to use certain procedures in dealing with accused persons. *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, these procedural safeguards apply only where individuals are subjected to custodial interrogation, which means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444.

{¶ 44} For purposes of deciding if "a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 27, citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). "Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry' of whether there was a ' "formal arrest or restraint on freedom of movement" ' of the degree associated with a formal arrest." *Id.*, quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). (Other citation omitted.)

{¶ 45} In applying the "reasonable person test," courts consider the following factors: "whether the encounter takes place in surroundings that are familiar to the suspect; the number of law enforcement officers present, as well as their conduct and demeanor; the degree of physical restraint imposed; and the duration and character of the interrogation." *State v. Farrell*, 2d Dist. Miami No. 99-CA-24, 1999 WL 812249, *3 (Oct. 8, 1999), citing *State v. Salyer*, 2d Dist. Miami No. 97-CA-39 (Apr. 10, 1998).

{¶ 46} In deciding whether Laster was functionally, if not formally, under arrest when he was being questioned by Officer Wilhelm, the trial court cited *State v. Sell*, 2d Dist. Montgomery No. 26458, 2015-Ohio-1940. *See* Doc. #29, Decision and Entry Overruling Defendant's Motion to Suppress, p. 2, citing *Sell* at ¶ 18. After discussing the facts, the court concluded that Wilhelm's order for Laster to put his hands on the wheel, without more, would not have led a reasonable person to believe he or she were under arrest. *Id.* at pp. 2-3.

{¶ 47} We agree with the trial court. Although Wilhelm testified that Laster was not free to leave, the officer's subjective intent was irrelevant. *Sell* at ¶ 17. Instead, "the issue is whether a reasonable person in the suspect's situation would have understood that he was in custody." *Id.*, citing *State v. Cross*, 2d Dist. Montgomery No. 25838, 2014-Ohio-1534, ¶ 13.

{¶ 48} In *Sell,* we also observed that during typical investigatory detentions like routine traffic stops, individuals are not " 'in custody' for purposes of *Miranda*." *Id.* at ¶ 18, quoting *State v. Cundiff*, 2d Dist. Montgomery No. 24171, 2011-Ohio-3414, ¶ 60. Although the detention in the case before us was not a routine traffic stop, it was similar to the stop involved in *State v. Keggan,* 2d Dist. Greene No. 2006-CA-9, 2006-Ohio-6663.

In *Keggan*, the police were dispatched to the defendant's home on a complaint that a male had threated another male with a shotgun. After pulling alongside the defendant's vehicle as he was attempting to leave his house, the police required the defendant to exit his truck, patted him down for weapons, and then placed him in a police cruiser. *Id*. at ¶ 6.

{¶ 49} In discussing the detention, we noted that "police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity has occurred or is about to occur." *Id*. at ¶ 30, citing *Terry*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 50} In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)*,* the Supreme Court stated that " '[T]he stop and inquiry must be "reasonably related in scope to the justification for their initiation." ' * * * Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Id*. at 439-440, quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). (Footnotes omitted.)

{¶ 51} As the trial court noted, Wilhelm was alone when he approached the car, ordered Laster to put his hands on the steering wheel, and questioned Laster about the gun. We agree with the trial court that this would not have led reasonable persons to conclude that they were under arrest. Wilhelm asked only a few brief questions to obtain information that could have dispelled his suspicions, and he did not subject Laster to

treatment that rendered him " 'in custody' for practical purposes * * *." *Berkemer* at 440. *Accord Keggan*, 2d Dist. Greene No. 2006-CA-9, 2006-Ohio-6663, at ¶ 31; *Sell*, 2d Dist. Montgomery No. 26458, 2015-Ohio-1940, at ¶ 18. Accordingly, the trial court did not err in concluding that Laster was not in custody and that his statements to Wilhelm were admissible.

## C. Interrogation After *Miranda* Warnings

**{¶ 52}** Finally, Laster contends that the trial court erred in refusing to suppress any statements that were made to Detective Gundelfinger. As was noted, Gundelfinger administered *Miranda* warnings to Laster after he arrived on the scene.

**{¶ 53}** In this regard, Laster relies on *State v. Cook*, 2d Dist. Montgomery No. 24524, 2012-Ohio-111. *Cook* involved a claim of successive interrogations where the first interrogation was unwarned, and the second contained *Miranda* warnings. *Id.* at ¶ 14-17, discussing *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 642 (2004). In addressing this issue, the trial court concluded that any statements made to Detective Gundelfinger did "not run afoul" of *Seibert* because Laster was not in custody when he made his initial statements to Wilhelm. Doc. #29 at p. 3. Again, we agree with the trial court.

**{¶ 54}** *Seibert* involved "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession," and an "interrogating officer who follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time." *Id.* at 604. The Supreme Court held that "[b]ecause this midstream recitation of warnings after interrogation and

unwarned confession could not effectively comply with *Miranda's* constitutional requirement, * * * a statement repeated after a warning in such circumstances is inadmissible." *Id.*

**{¶ 55}** The fact that a police protocol was involved in *Seibert* was not the decisive point, because "the intent of the officer doing the questioning is not relevant in a *Miranda* analysis." *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 35. As the Supreme Court of Ohio noted, "*Seibert* presented the rare case in which the officer admitted that the two-part questioning was intentionally coercive." *Id.*

**{¶ 56}** Nonetheless, in order for *Seibert* to apply, there must be a custodial interrogation. *See State v. Hayes*, 2d Dist. Montgomery No. 25940, 2015-Ohio-1043, ¶ 23-24 (finding defendant was in custody, but was not interrogated for purposes of applying *Seibert*, because she initiated the conversation with a detective and there was no indication that the detective "made any effort, calculated or otherwise, to elicit incriminating statements").

**{¶ 57}** Other cases have made similar conclusions. *See State v. Zan*, 2d Dist. Montgomery No. 24600, 2013-Ohio-1064, ¶ 28 (distinguishing *Seibert* because the defendant was not in custody when she made pre-*Miranda* statements to the police); *State v. Sosnoskie*, 2d Dist. Montgomery No. 22713, 2009-Ohio-2327, ¶ 61-62 (*Seibert* did not apply because the defendant was not in custody during her first interview and police were not required to read her *Miranda* warnings); *State v. Lux*, 2d Dist. Miami No. 2010-CA-30, 2012-Ohio-112, ¶ 33 (pre-*Miranda* statements were made in a non-custodial context and did not make the defendant's later statements inadmissible under *Seibert*). *See also State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 24

("the requirement that police officers administer *Miranda* warnings applies only when a suspect is subjected to both custody and interrogation"). Accordingly, the trial court did not err in concluding that Laster's statements to Detective Gundelfinger were admissible.

{¶ 58} Based on the preceding discussion, the trial court did not err in overruling Laster's motion to suppress evidence.

## IV.   Conclusion

{¶ 59} All of Laster's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
J. David Turner
Hon. Dennis J. Langer