**[Cite as *State v. Taylor*, 2021-Ohio-4338.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 29170 |
| | : | |
| v. | : | Trial Court Case No. 2021-CR-492 |
| | : | |
| ANGELO LEE TAYLOR | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of December, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellant

ANGELINA N. JACKSON, Atty. Reg. No. 0077937, 117 South Main Street, Suite 400, Dayton, Ohio 45422
      Attorney for Defendant-Appellee

. . . . . . . . . . . . .

EPLEY, J.

{¶ 1} Pursuant to R.C. 2945.67(A) and Crim.R. 12(K), the State of Ohio appeals the trial court's judgment granting Angelo Lee Taylor's motion to suppress. For the following reasons, the trial court's judgment will be reversed and the matter will be remanded for further proceedings.

## I. Facts and Procedural History

{¶ 2} The State's evidence at the suppression hearing established the following facts.

{¶ 3} At approximately 4:40 p.m. on February 9, 2021, Huber Heights Police Officers Gabrielle Cahill and Christopher Elliott each received a dispatch to Planet Fitness, located at 7651 Old Troy Pike, on a report of a disorderly individual. According to Officer Cahill, the dispatcher reported that a disorderly subject was asked to leave because he was not wearing a mask and that he refused to leave. Officer Elliott added that when the subject was confronted, he ran into the locker room. At the time of the incident, the State of Ohio required individuals to wear masks indoors due to the ongoing Covid-19 pandemic. The dispatcher provided the subject's race and described him as "wearing a black hoodie, wearing black basketball shorts, [and] carrying a black bag."

{¶ 4} Officer Cahill arrived on the scene first and saw a man who matched the reported description walking out of the front door of Planet Fitness. Officer Cahill asked the man, later identified as Taylor, to stop so that she could speak with him about what had happened inside the fitness center. Taylor stopped and described to Officer Cahill what had occurred. Taylor reported that he had been told to put on a mask, but his mask was in his locker. When staff told Taylor to leave, Taylor had responded that he was

going to get his belongings first. After retrieving his belongings, Taylor cancelled his membership and left.

{¶ 5} Officer Cahill told Taylor that she was not going to enforce the mask mandate, but she needed his information to log that she had talked with him. After initially stating that his name was private, Taylor provided his name, but stated that he would not give additional information because he did not want a "contract." The officer told Taylor that she needed the information because she was called to that location for an incident and needed to know with whom she was speaking and that he was not "some wanted murderer on a warrant [sic] spree." Taylor asserted that his personal information was his private property. When asked if he had a driver's license, Taylor said that he did not and that he was from Georgia.

{¶ 6} While Officer Cahill was speaking with Taylor, Officer Elliott arrived and went inside the Planet Fitness. He testified that he went inside to get information from employees about "how they wanted to proceed moving forward, see what the actual incident occurred within Planet Fitness, what type of disorderly conduct we were looking at, if there was anything more criminal we had to investigate." Officer Elliott's body camera showed that he simply asked Planet Fitness staff if they wanted Taylor trespassed. After staff responded affirmatively, Elliott walked out and informed Officer Cahill and Taylor that the fitness center was having him trespassed from that location.

{¶ 7} Officer Cahill told Taylor that, because Planet Fitness wanted him trespassed, "it's turned into criminal" and they needed Taylor's information so that they could provide a criminal trespass notice for the premises. During her suppression hearing testimony, Officer Cahill again indicated that she needed Taylor's identifying

information to provide a trespass warning. She acknowledged, however, that a private business can trespass a person without police intervention.

{¶ 8} After Taylor responded that he did not want to provide his information, Officer Elliott stated that he would be charged if he failed to provide it. Taylor reluctantly provided his name and date of birth. Officer Elliott confirmed Taylor's name and date of birth with Planet Fitness staff. The officer then went to his cruiser, and upon running Taylor's identity through the Law Enforcement Automated Data System (LEADS) database in his cruiser's computer, he learned that Taylor had an arrest warrant. Officer Elliott went back into Planet Fitness and asked if they had a Social Security number or driver's license number for Taylor; the fitness center did not.

{¶ 9} Officer Elliott returned to Taylor and asked for his Social Security number so he could verify if Taylor was the individual with a warrant. Taylor stated that he did not use a Social Security number and denied that he had a warrant. Officer Elliott asked Officer Cahill to go to his cruiser to see if she believed that Taylor matched the photo in LEADS. Officer Cahill agreed that it "looks almost identical."

{¶ 10} After the dispatcher confirmed the warrant, the officers arrested Taylor on the outstanding warrant. Upon searching Taylor, Officer Elliott found a magazine with seven rounds in his hoodie. A loaded gun was located in Taylor's gym bag. Taylor's encounter with the police – from the beginning of Officer Cahill's body camera recording until his arrest – lasted approximately 20 minutes.

{¶ 11} A month later, Taylor was indicted for carrying a concealed weapon and having weapons while under disability. Taylor sought to suppress any evidence obtained from his stop and detention and any statements he had made. The court held a hearing

on May 14, 2021, during which Officers Cahill and Elliott testified and the State presented a CD with photographs of the seized weapon and bullets and the officers' body camera footage from the incident. Officer Cahill's body camera footage began during her conversation with Taylor outside of Planet Fitness. Officer Elliott's footage began with his arrival on scene.

{¶ 12} After post-hearing briefing, the trial court granted Taylor's motion. The court reasoned, in relevant part:

> In the case at bar, this Court finds absolutely no description of any criminal or suspicious activity by the Defendant. Additionally, even the dispatch did not refer to any criminal or suspicious activity by the Defendant.
>
> Accordingly, the Court finds the initial detention of the Defendant in violation of the Fourth Amendment and therefore sustains the defense motion to suppress. All evidence attained subsequent to the aforementioned violation is **Suppressed**.

(Emphasis sic.)

{¶ 13} The State appeals from the trial court's ruling. It argues that Taylor was lawfully detained while the officers investigated the disorderly conduct complaint. It further claims that, even if the initial detention were unlawful, "the causal connection between the detention and discovery of the firearm was sufficiently attenuated by the existence of a valid warrant for Taylor's arrest."

## II. Lawfulness of Taylor's Detention

{¶ 14} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88

S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Whether a stop and/or search is reasonable under the Fourth Amendment depends upon the particular facts and circumstances, viewed objectively by examining the totality of the circumstances. *See State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 14.

{¶ 15} Police officers may briefly stop and/or temporarily detain individuals to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity has occurred, is occurring, or is about to occur. *Terry*; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8; *State v. Laster*, 2d Dist. Montgomery No. 27762, 2018-Ohio-3601, ¶ 49. Reasonable suspicion of any criminal offense, even a minor misdemeanor, is sufficient to justify an investigatory detention. *See, e.g., Mays* at ¶ 8 (stop based on reasonable suspicion of a traffic violation is constitutionally valid); *State v. Allen*, 2d Dist. Montgomery No. 28874, 2021-Ohio-3047, ¶ 38 (officers lawfully stopped defendant based on reasonable articulable suspicion that defendant had jaywalked, a minor misdemeanor).

{¶ 16} We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). *See also State v. Tidwell*, 2021-Ohio-2072, __ N.E.3d. __, ¶ 20. "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less

than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." (Citation omitted.) *Kansas v. Glover*, __ U.S. __, 140 S.Ct. 1183, 1187, 206 L.Ed.2d 412 (2020).

{¶ 17} The Ohio Supreme Court has recently emphasized that reasonable suspicion for a *Terry* stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Tidwell* at ¶ 20, quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Both the quantity and quality of the information must be considered when evaluating whether there is reasonable suspicion. *Id.*, citing *White* at 330 and *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

{¶ 18} The duration of a *Terry* stop is determined by the purpose for which it was initiated, and the detention may not last longer than is necessary to accomplish that purpose. *See Rodriguez v. United States*, 575 U.S. 348, 354, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015) (addressing whether officers unlawfully prolonged a traffic stop); *State v. Cook*, 65 Ohio St.3d 516, 521, 605 N.E.2d 70 (1992) ("An investigatory *Terry* stop is a limited infringement on personal freedom, and is proper when based on articulable facts constituting reasonable suspicion and the subsequent investigation is pursued diligently in a manner likely to confirm or dispel suspicion quickly."). The reasonableness of the detention "depends on what the police in fact do," and the officer's diligence is measured "by noting what the officer actually did and how he did it." *State v. Hall*, 2017-Ohio-2682, 90 N.E.3d 276, ¶ 13 (2d Dist.), quoting *Rodriguez* at 357. An officer may not prolong a *Terry* stop even if the "overall duration of the stop remains reasonable in relation to the duration of other [ ] stops involving similar circumstances." *Id.*

**{¶ 19}** During a brief investigatory stop, an officer is entitled to ask questions to confirm or dispel his or her suspicions that criminal activity occurred. *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 23 (2d Dist.). Moreover, "it is well established that an officer may ask a suspect to identify himself in the course of a *Terry* stop." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 187, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004). "[A]n officer can ask for identification or sufficient information to write a citation or to run a background check for outstanding warrants, often called a 'field investigation.' " *Millerton* at ¶ 23, citing *State v. Wortham*, 145 Ohio App.3d 126, 761 N.E.2d 1151 (2d Dist.2001) and *State v. Harrison*, 2d Dist. Montgomery No. 25128, 2013-Ohio-1235; *see, e.g., State v. Young*, 2018-Ohio-164, 104 N.E.3d 128, ¶ 12 (8th Dist.) ("Courts have recognized that police may ask a suspect for identification during an investigatory stop to check for warrants."). Moreover, police officers may communicate with others, either law enforcement officers or private citizens, "to confirm the identification or determine whether a person of that identity is otherwise wanted." *Michigan v. Summers*, 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), fn. 12, quoting 3 W. LaFave, Search and Seizure § 9.2, p. 36-37 (1978).

**{¶ 20}** We further note that, pursuant to R.C. 2921.29(A)(1), an individual in a public place is required to disclose his name, address, and date of birth upon request by a police officer who reasonably suspects the person is committing, has committed, or is about to commit a criminal offense. The failure to comply, however, generally does not constitute obstructing official business.

**{¶ 21}** Ultimately, "when an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek

to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 762-763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

{¶ 22} In this case, we conclude that Officer Cahill had reasonable articulable suspicion of criminal activity to justify an investigatory detention of Taylor. Cahill testified at the suppression hearing that she and Officer Elliott were dispatched to Planet Fitness on a report of a "disorderly subject" who "refused to leave" when asked by staff. These allegations, which apparently came from Planet Fitness staff, indicated that an individual was engaged in disruptive behavior, which possibly could constitute the offense of disorderly conduct, and was remaining on the property without permission, which possibly could constitute trespassing. The dispatcher provided a description of the individual, and when Officer Cahill arrived, she saw Taylor, a person matching that description, leaving the facility. Officer Cahill acted reasonably when she stopped Taylor to investigate what had occurred there and to determine whether his conduct did, in fact, constitute criminal behavior. The fact that Officer Cahill did not see Taylor engaging in criminal conduct when she arrived and ultimately determined that she was not going to charge Taylor based on the incident inside Planet Fitness did not negate the lawfulness of the *Terry* stop.

{¶ 23} Having lawfully stopped Taylor to investigate what had occurred inside Planet Fitness, Officer Cahill then was entitled to ask Taylor for his identifying information so that she could run his information for outstanding warrants. She did so approximately 90 seconds into her body camera footage, explaining to Taylor why she needed the information. Taylor expressed his understanding and offered an unofficial identification card, stating that his identifying information was private. {(It is apparent from the

language used by Taylor that he considers himself a sovereign citizen).

{¶ 24} During this time, Officer Elliott had arrived and gone inside Planet Fitness to inquire whether the staff wanted Taylor trespassed from the facility. Notwithstanding the limited nature of Officer Elliott's investigation inside the fitness center, Officer Cahill reasonably continued to detain Taylor while Officer Elliott spoke with Planet Fitness staff about the incident.

{¶ 25} Approximately four and one-half minutes into Cahill's body camera footage, Officer Elliott informed Officer Cahill and Taylor that Planet Fitness wanted him trespassed. At this juncture, the officers reasonably asked for Taylor's identifying information to complete a criminal trespass notice, as well as run his information to search for warrants. Although Officer Cahill testified that police intervention was not necessary to trespass an individual, the officers acted reasonably in relation to circumstances justifying the stop when they continued to inquire about Taylor's identity and then ran his information through LEADS. The record further reflects that the officers diligently discharged these duties.

{¶ 26} Upon learning of the existence of an arrest warrant for Taylor and the confirmation of that warrant by dispatch, the officers were entitled to arrest Taylor and conduct a search incident to that arrest. The officers lawfully found the gun and magazines during such a search.

{¶ 27} Accordingly, we conclude that the trial court erred in granting Taylor's motion to suppress. The State's assignment of error is sustained.

### III. Conclusion

{¶ 28} The trial court's judgment will be reversed, and the matter will be remanded

for further proceedings.

. . . . . . . . . . . . .

TUCKER, P. J., concurs.

DONOVAN, J., concurs:

{¶ 29} If this was simply a refusal to don a mask, I would agree with the trial court's analysis that no crime was described by dispatch for the officers to investigate. However, as the majority opinion notes, the officers were responding to a complaint of a disorderly subject refusing to leave a private business. The *Terry* stop was lawful, hence the officers had a duty to determine if a violation of law – disorderly conduct/trespass -- had occurred. Even if no arrest was going to be made, I can find no authority that establishes the officers violated Taylor's rights in identifying with whom they were speaking for their records and in determining if any outstanding warrants existed for his arrest.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Angelina N. Jackson
Hon. Richard S. Skelton